**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL GIORGIO and KIRTI NAIK,<br><br>     Plaintiffs,<br><br>  v.<br><br>SMC BLOCKCHAIN LABS, LLC, SAIFUL KHANDAKER, RABIUL KARIM, SMC LABS, SMC LABS BD, LTD, TOI LABS, LLC, TOI CHAIN, and REVOFAST VENTURE LLC,<br><br>     Defendants. | Case No.: 26-cv-00475 (LJL)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Michael Giorgio and Kirti Naik ("Plaintiffs") state as their complaint against Defendants SMC Blockchain LLC, Saiful Khandaker, Rabiul Karim, SMC Labs, SMC Labs Bd, Ltd., TOI Labs, LLC, TOI Chain, and Revofast Venture LLC ("Defendants") as follows:

**NATURE OF THE ACTION**

1. Defendant Khandaker has created a slew of companies – some legitimate, some not – to further his business ambition in the arena of blockchain security and protocol. Over time, Khandaker has made numerous knowingly false statements to induce investors, vendors, and employees to contribute services and finances to his blockchain technology ambition, without providing due payment in return. When all bridges were burned, Khandaker simply continued his scheme under different company names, without regard to the multitude of unpaid creditors and employees left in his wake. Plaintiffs are two of his victims.

2. Plaintiffs bring this action against Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, violations of the New York Labor Law for failure to pay wages and failure to provide accurate wage statements, and fraudulent inducement.

3. Plaintiffs are professionals in their respective fields who left or forewent high-paying job opportunities and put their professional reputations on the line to work for SMC Blockchain LLC ("SMC") based on Defendants' statements regarding SMC's liquidity, financial sustainability, business prospects, and potential future earnings.

4. Although Defendants knew that SMC was not solvent and did not have any guaranteed investment streams, they misrepresented and omitted material facts regarding SMC's financial health and made false promises. When SMC did receive investments, Defendants diverted the funds to other business or personal projects under Defendants' control, instead of paying Plaintiffs, other SMC employees, and SMC creditors.

5. Defendants also induced Plaintiffs to loan money to SMC via promissory notes, again based on false promises on which Plaintiffs reasonably relied, with no intention or prospects of ever repaying those loans.

6. In fraudulently inducing Plaintiffs to work for, and loan money to, SMC, and then refusing to pay their wages or repay their promissory notes, Defendants breached their contractual and common law obligations to Plaintiffs, and violated Plaintiffs' rights to wages under the New York Labor Law ("NYLL").

7. Plaintiffs seek compensatory damages, unpaid wages, statutory and liquidated damages, declaratory, equitable and injunctive relief, attorneys' fees and costs, as well as pre-judgment and post-judgment interest.

## THE PARTIES

### Plaintiff Michale Giorgio

8. Plaintiff Michael Giorgio ("Giorgio") is a resident of New York, currently residing in Nassau County.

9. Giorgio has a Bachelor's degree in Computer Science from St. John's University, and an MBA from Quinnipiac University. He has over 23 years of regulatory, compliance and related business experience in the financial technology ("fintech") industry.

10. Giorgio was employed as a Chief Executive Officer ("CEO") (and later, along with Dr. Justin Shi, co-CEO) for SMC from March 1, 2023 through May 7, 2025, and he resided in New York and worked remotely from New York throughout his employment.

11. Giorgio is a covered employee of Defendants within the meaning of the NYLL.

**Plaintiff Kirti Naik**

12. Plaintiff Kirti Naik ("Naik") is a resident of New York, currently residing in New York County.

13. Naik has a bachelor's degree in Corporate Communications and Marketing from CUNY and an MBA from Columbia Business School. She has over 25 years of marketing, analytics, public relations and communications experience across fintech, banking, and entertainment brands.

14. Naik was employed as a Chief Marketing Officer ("CMO") for SMC from June 1, 2023 through May 7, 2025, and she resided in New York and worked remotely from New York throughout her employment.

15. Naik is a covered employee of Defendants within the meaning of the NYLL.

**Defendant SMC**

16. SMC was Plaintiffs' employer during all relevant times, and is an "employer" as defined by the New York Labor Law.

17. SMC is a limited liability corporation, incorporated in Wyoming in 2022.

18. The State of Wyoming Secretary of State identifies the principal and mailing addresses for SMC to be 331 Quail Dr. N, Phoenixville, PA, 19460.

19. 331 Quail Dr. N, Phoenixville, PA, 19460 is a residential address owned, at least as of the time of SMC's incorporation, by Defendant Rabiul Karim.

20. Throughout most of the relevant period, SMC was headquartered at 100 Springhouse Drive, Suite 204, Collegeville, Pennsylvania 19426. In or around August 2024, SMC (and its related entities as described herein, including Revofast Venture LLC and Fintech Ecosystem Development Corporation) moved to another office, also located in Pennsylvania at 630 Freedom Business Center, Suite 300, King of Prussia, Pennsylvania 19406.

21. SMC is a technology company for wealth management and digital wallet applications that utilizes blockchain technology to improve the efficiency of financial transactions, especially in emerging markets. SMC intends to utilize patents created by Co-Founder Dr. Justin Shi for Active Content Addressable Networking (ACAN) and Statistical Multiplexed Computing (SMC) to create a blockchain platform with "unlimited scalability."

22. SMC has had continuous and systematic contacts with the State of New York, employed Plaintiffs to work in New York, and made statements and took other actions to knowingly and intentionally harm Plaintiffs in New York.

23. Throughout the relevant period, SMC also regularly conducted business in New York and throughout the United States and internationally, including by advertising, marketing and raising millions of dollars in capital from individual and corporate investors. In so doing, SMC relied on nationwide and international means of commerce, including internet, phone and interstate and international banking and travel.

**Defendant Saiful Khandaker**

24. Defendant Saiful Khandaker ("Khandaker") is a resident of Pennsylvania, residing at 71 Goldfinch Circle, Phoenixville, Pennsylvania 19460.

25. Khandaker is the founder, owner and Chairman of SMC. Khandaker managed, directed and dominated SMC from its inception, including by making all key decisions about hiring, personnel, investments, vendors, partners and other strategic business decisions, and used his control over SMC to defraud and harm Plaintiffs.

26. Khandaker claims a 70% ownership interest in SMC, is among the top ten members of SMC in terms of percentage ownership interest, and has represented himself to others as a majority owner of SMC. Accordingly, he shares liability for SMC's obligations to Plaintiffs under the NYLL, New York Business Corporations Law ("NY BCL") § 630(a) and New York Limited Liability Corporations Law ("NY LLCL") § 609.

27. Plaintiffs provided Khandaker and other Defendants with notice of liability under NY BCL § 630(a) on May 7, 2025, which is substantially identical to notice of liability required under NY LLCL § 609, and which Defendants acknowledged on or around August 4, 2025.

28. During all relevant times, Khandaker employed and acted as an employer of Plaintiffs within the meaning of the NYLL. He maintained control, oversight, and direction over Plaintiffs with respect to hiring, payroll, and other employment practices that applied to them, and he had authority to terminate their employment.

29. Khandaker has had continuous and systematic contacts with the State of New York, employed Plaintiffs to work in New York, and made statements and took other actions to knowingly and intentionally harm Plaintiffs in New York.

30. Throughout the relevant period, Khandaker also regularly conducted business in New York and throughout the United States and internationally, including by advertising, marketing and raising millions of dollars in capital from individual and corporate investors nationwide and internationally. In so doing, Khandaker relied on nationwide and international means of commerce, including internet, phone and interstate and international banking and travel.

31. With respect to each business entity identified in this complaint, including the business entity defendants (SMC, SMC Labs, SMC Labs Bd, Ltd., TOI Labs, TOI Chain, and Revofast Venture), Khandaker has disregarded and abused the corporate form for personal benefit and to improperly avoid company debts and obligations.

**Defendant Rabiul Karim**

32. Defendant Rabiul Karim is a resident of Pennsylvania.

33. Karim is a member of SMC and among the top ten members in terms of percentage ownership interest, and accordingly shares liability for SMC's obligations to Plaintiffs under the NYLL, New York Business Corporations Law ("NY BCL") § 630(a) and New York Limited Liability Corporations Law ("NY LLCL") § 609.

34. Plaintiffs provided Karim and other Defendants with notice of liability under NY BCL § 630(a) on May 7, 2025, which is substantially identical to that required under NY LLCL § 609, and which Karim acknowledged on or around August 4, 2025.

35. Karim has had continuous and systematic contacts with the State of New York and made statements and took other actions to knowingly and intentionally harm Plaintiffs in New York.

36. Throughout the relevant period, Karim also regularly conducted business in New York and throughout the United States and internationally, including by advertising, marketing

and raising millions of dollars in capital from individual and corporate investors nationwide and internationally. In so doing, Karim relied on nationwide and international means of commerce, including internet,

**Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain**

37. According to The State of Wyoming Secretary of State, SMC's registration status is "Inactive – Administratively Dissolved" and is listed as "Delinquent" for failure to pay taxes.

38. Upon information and belief, however, SMC has not taken any formal steps to wind down, de-register or close SMC, and SMC continues to operate as "SMC Labs," as well as under several related entities, all owned, founded, and created by Khandaker.

39. Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain, as with SMC and Khandaker's prior ventures (e.g., Revofast Ventures LLC, FEDC), fail to follow corporate formalities and are directed and managed by Khandaker.

40. Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain, to the extent they are not fictitious entities, continue the business of SMC and have acquired all or substantially all of SMC liabilities, including the specific debts and obligations to Plaintiffs identified in this complaint.

41. SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain systematically and continuously conduct business in New York and throughout the United States and internationally, including by advertising, marketing and raising millions of dollars in capital from individual and corporate investors. In so doing, SMC relied on nationwide and international means of commerce, including internet, phone and interstate and international banking and travel.

42. Upon information and belief, SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain all utilize 630 Freedom Business Center, Suite 300, King of Prussia, Pennsylvania 19406, the address for SMC, as their principal place of business.

### *Defendant SMC Labs*

43. Defendant SMC Labs is the same company as SMC. Alternately, it is a successor in interest to SMC, a mere continuation of SMC, a *de facto* merger with SMC, and/or a fraudulent attempt to avoid the liabilities and debts of SMC.

44. Upon information and belief, Defendant SMC Labs is not a business registered with any state and has not been formally incorporated or registered.

45. SMC Labs' business address is 630 Freedom Business Center, Suite 300, King of Prussia, PA 19406, the same address as SMC.

46. The SMC Labs webpage (www.smclabs.tech) identifies Khandaker as Co-founder & Chairman, and Dr. Justin Shi as Co-founder & Co-CEO. Shi identifies himself in his online curriculum vitae (https://cis.temple.edu/~shi/) as, "Co-Founder, Co-CEO, SMC Labs, LLC. King of Prussia, Pennsylvania," since 2022. Khandaker's SMC Labs website bio highlights his role with Fintech Ecosystem Development Corporation ("FEDC"), the SPAC connected to SMC.

47. The SMC Labs webpage further identifies Anku Aravind as its Blockchain Architect and Michael Tomczyk as a Senior Advisor.

48. During Plaintiffs' employment with SMC, these four individuals were likewise employed by SMC and held the same roles. SMC Labs does not list a second co-CEO. However, Giorgio was co-CEO with Shi during his employment at SMC.

49. The SMC Labs webpage describes it as specializing in "fault tolerant high-performance transaction processing and communication technologies," including having founded

the "SMC Blockchain Organization" in 2023. Its mission is to, "deliver unlimited scalability to traditional and emerging service infrastructures" utilizing Active Content Addressable Networking (ACAN) and Statistical Multiplexed Computing (SMC).

50. SMC Labs' webpage states that, "In 2023, the formal leadership (CEO, CTO, CMO, COO) and board members are appointed along with a formalized product roadmap that includes protocol, wallet, token, and exchange." Each is an event in which Plaintiffs were involved (as CEO and CMO) during their employment with SMC.

51. SMC Labs' LinkedIn page (https://www.linkedin.com/companysmclabs) describes a company identical to SMC that is headquartered in Collegeville, PA. The link to SMC Labs' website is www.smcblockchain.org which, until Plaintiffs filed their original state court complaint 656631/2025 on December 22, 2025, automatically re-directed to the SMC Labs webpage, www.smclabs.tech. The profile photograph for the LinkedIn is an image with the words "SMC Blockchain."

### Defendant SMC Labs Bd, Ltd.

52. Defendant SMC Labs Bd, Ltd. is a successor in interest to SMC, a mere continuation of SMC, a *de facto* merger with SMC, and/or a fraudulent attempt to avoid the liabilities and debts of SMC.

53. Since 2024, SMC has recruited for engineers, HR, and other roles in the U.S. and Bangladesh, under the business names SMC Labs and SMC Labs Bd, Ltd., using both names in the same job postings. SMC Labs Bd, Ltd. describes itself as "SMC Labs," as being U.S. based, and being "a research and development company specializing in fault tolerant high-performance transaction processing and communication technologies," the identical language used by SMC and SMC Labs. In job postings, it lists its website as www.smclabs.tech.

54. Upon diligent search Plaintiffs are unable to locate a U.S. business registration for SMC Labs or SMC Labs Bd, Ltd.

55. Job postings from SMC Labs Bd, Ltd. list Level 8, Police Plaza Concord Shopping Center, Gulshan 1, Dhaka, Bangladesh as its business address. However, a search of the web directory for that address does not list SMC Labs Bd, Ltd. as a tenant.

### Defendant TOI Labs

56. Defendant TOI Labs is a successor in interest to SMC, a mere continuation of SMC, a *de facto* merger with SMC, and/or a fraudulent attempt to avoid the liabilities and debts of SMC.

57. In or about the summer of 2023, Plaintiff Naik, along with an outside branding agency, created the name "TOI" for SMC's proprietary blockchain protocol. Naik then prepared investor decks to help SMC fundraise for development of the platform and related projects. Elements of those investor decks are still used on the SMC Labs' webpage.

58. Although TOI Labs does not have a webpage, its ostensible webpage, www.TOIlabs.io, redirects to SMC Labs' website (www.SMClabs.tech).

59. YouTube videos evangelizing TOI Labs identify the entire SMC Labs' team – Khandaker, Shi, Arvind, and Tomczyk, as well as Michael Hyde, SMC Labs' VP of Technology Development and Jenny Junkeer, a SMC Labs Senior Advisor – as the team behind TOI Labs, with Khandaker as Co-founder and CEO of the company. The videos refer to a strategic vision for TOI Labs that is identical to that of SMC, and its successor, SMC Labs; that is, to build an infinitely scalable blockchain protocol.

60. Defendant TOI Labs is a Limited Liability Company registered in the state of Wyoming in 2025. Its business address is the same as its registered agent's address: Republic

Registered Agent, LLC, 5830 E 2nd St., Ste 7000, #27657, Casper, WY 82609; the same

registered agent used by SMC.

### *Defendant TOI Chain*

61. Defendant TOI Chain is a successor in interest to SMC, a mere continuation of SMC,

a *de facto* merger with SMC, and/or a fraudulent attempt to avoid the liabilities and debts of

SMC.

62. TOI Chain describes itself as a "collaboration" with SMC Labs, but also describes

itself as an "infinitely scalable" blockchain platform that relies on ACAN/SMC technology; i.e.,

the same product SMC purported to be developing while it employed Plaintiffs.

63. On information and belief, TOI Chain is not a business registered with any state and

has not been formally incorporated or registered.

64. SMC Labs' webpage contains a link to the TOI Chain webpage (toichain.org). Both

webpages offer "White Papers."  The white papers are nearly identical versions of the same

document, although the TOI Chain white paper appears to be dated one month later than the

version on the SMC Labs webpage. Both documents use the same header, which identify TOI

Chain and SMC Labs identically.

65. TOI Chain claims to be in an active fundraise of $50 million.

### **Defendant Revofast Venture LLC**

66. Defendant Revofast Venture LLC is an active Limited Liability Company that was

incorporated in Wyoming in 2021.

67. Until around August 2024, Revofast Venture LLC was headquartered at 100

Springhouse Drive, Suite 204, Collegeville, Pennsylvania 19426.  Upon information and belief,

after August 2024, Revofast Venture LLC relocated (together with SMC and other related

entities as alleged herein) to 630 Freedom Business Center, Suite 300, King of Prussia, Pennsylvania 19406.

68. Defendant Revofast Venture LLC (along with a now defunct company, Revofast LLC) was founded by Defendant Saiful Khandaker to sponsor, take ownership interests in, and facilitate financial transactions between other entities that Khandaker owned or controlled, including SMC and Fintech Ecosystem Development Corporation. Khandaker is the founder, owner, and manager of Revofast Venture, and managed, directed, and dominated Revofast Venture from its inception, including by making all key business decisions.

69. Revofast Venture has had continuous and systematic contacts with the State of New York, and acting through its founder, owner and controlling member Defendant Saiful Khandaker, made statements and took other actions to knowingly and intentionally harm Plaintiffs in New York.

70. Throughout the relevant period, Revofast Venture also regularly conducted business in New York and throughout the United States and internationally, including by advertising, marketing and raising millions of dollars in capital from individual and corporate investors nationwide and internationally.  In so doing, Revofast Venture relied on nationwide and international means of commerce, including internet, phone and interstate and international banking and travel.

## JURISDICTION AND VENUE

71. This matter was originally filed on December 22, 2025, in the Supreme Court of New York, New York County, as *Giorgio and Naik v. SMC Block Chain Labs, LLC, et al.*, Index No. 656631/2025. Plaintiffs served the summons and complaint on Defendants Khandaker, Karim, SMC and Revofast Venture LLC.

72. On January 19, 2026, Defendants Khandaker and Karim filed a Notice of Removal in this action, *Giorgio and Naik v. SMC Block Chain Labs, LLC, et al.*, Case No. 1:26-cv-00475 (S.D.N.Y.). Defendants SMC and Revofast LLC have not filed any objection to the Notice of Removal of Defendants Khandaker and Karim.

73. This court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, because each of the Defendant parties is a citizen of a different State than Plaintiffs, and the amount in controversy exceeds $75,000.

74. This Court has personal jurisdiction over Defendants, who at all relevant times regularly transact or transacted business in the District, and have committed acts within the District that have caused injury to persons and/or property within the District.

75. This court has personal jurisdiction over Defendants as alter egos of and/or successors in interest to parties properly subject to the jurisdiction of this Court.

76. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions in this action occurred within the Southern District of New York.

## **FACTUAL ALLEGATIONS**

### I.    **KHANDAKER MISREPRESENTED SMC AND ITS PROSPECTS IN ORDER TO RECRUIT PLAINTIFFS**

**Khandaker Created SMC, Revofast Venture, and FEDC**

77. Khandaker is a businessman who launched various global startup companies in the fintech industry prior to creating SMC, Revofast Venture, and a related entity, Fintech Ecosystem Development Corporation ("FEDC").

78. Khandaker operated all of his companies, including SMC, Revofast Venture, and FEDC, without corporate formalities such that all business were treated as one enterprise designed to serve his interests.

79. In 2021, Khandaker founded FEDC as a blockchain-based banking platform that he hoped would provide digital wallet, financing and transactional services in Bangladesh, Mexico, Brazil, India and other emerging markets.

80. Khandaker was the founder, president, owner, and CEO of FEDC, and at all times exercised complete control of the company.

81. Khandaker registered FEDC with the Securities Exchange Commission ("SEC") as a Special Purpose Acquisition Company ("SPAC") that raised millions of dollars in financing commitments and was intended to merge with two other entities (Rana and Afinoz) to become a publicly traded corporation on the NASDAQ exchange.

82. Khandaker initially hired Naik to perform marketing and branding work primarily for FEDC, and then later hired her to work full-time exclusively as the CMO for SMC.

83. Khandaker also founded Revofast Venture as a sponsor entity that owned shares in FEDC and was responsible for transferring funds to FEDC to ensure that it was adequately capitalized throughout the merger period.

84. Khandaker was the Manager and Managing Member of Revofast Venture.

85. In or around March 2022, Khandaker also founded SMC as a software company that he claimed would supply proprietary technology to operate FEDC's banking platform under a license to FEDC.

86. Khandaker was the founder, owner and Chairman of SMC, and he also acted as an employer and manager over SMC employees, including Plaintiffs.

87. Khandaker enlisted Karim to act as the initial member of SMC on SMC's incorporation paperwork.

88. At Khandaker's direction, Karim was involved in hiring Giorgio, attending board and investor meetings, and signing incorporation documents for SMC.

89. Khandaker and Karim regularly traveled to New York for SMC business, including to meet with potential investors, and to engage in business networking and meetings in New York. Through these meetings, which took place in late 2022, 2023, and beyond, Khandaker and Karim raised money from investors who were based in New York or who traveled to New York for business purposes, including Manhattan West, among others.

90. Khandaker and Karim met with Plaintiffs in New York regarding their potential employment with SMC.

91. Giorgio met with Khandaker and Karim for his interview with SMC in Lower Manhattan in the fall of 2022. Following that interview, Khandaker and Karim attended other meetings with investors in Manhattan.

92. Khandaker met with Naik on the Upper West Side of Manhattan in the fall of 2022, during which time he discussed her role with FEDC and recruited her to work for SMC. After meeting with Naik, Khandaker attended other meetings with investors in Manhattan.

93. Khandaker and Karim had daily or weekly meetings and communications with New York-based investors, partners and employees, including Plaintiffs, over the phone and internet.

94. Khandaker and Karim regularly marketed and advertised SMC online and via other means nationwide and internationally, regularly communicated with investors nationwide and internationally, and traveled to other U.S. states and internationally (including to the United Kingdom, Bangladesh and elsewhere) to secure business partners and investments for SMC.

**SMC and Khandaker Induce Plaintiffs to Work for SMC**

95. In recruiting Plaintiffs to work at SMC, SMC and Khandaker assured Plaintiffs that SMC was a viable and financially successful company that was backed by committed institutional and private investors, future funding streams, and breakthrough technology. Plaintiffs reasonably relied on these statements, based in part on documents that Khandaker showed Plaintiffs.

96. SMC and Khandaker made these statements directly to Plaintiffs and indirectly through Storm Recruiter, a recruitment agency that SMC and Khandaker used to hire Plaintiffs and other employees. Based on SMC's and Khandaker's representations, Storm Recruiter told Plaintiffs that SMC had secured millions of dollars in funding and had excellent prospects for success.[1] Khandaker also directly told Plaintiffs that SMC had already raised millions of dollars in funding when he was recruiting them.

97. Khandaker also used FEDC's purported success to lure Plaintiffs into working for SMC. He showed Plaintiffs SEC documents showing that FEDC had been registered as a SPAC on NASDAQ with approximately $115 million in IPO funding from institutional investors.

98. Khandaker told Plaintiffs, as confirmed by press releases he drafted, that the boards of directors of both Rana and Afinoz had unanimously approved the proposed mergers with FEDC, which were scheduled to occur in the first quarter of 2023, and that Rana and Afinoz had been valued at $78.0 million and $120 million, respectively. The mergers never occurred.

---

[1] Khandaker and SMC, consistent with their approach to most debts, did not pay Storm Recruiter its placement fee related to Giorgio or Naik.

99. SMC and Khandaker also made specific, false representations to Plaintiffs about the company's funding and ability to remain as a going concern, on which Plaintiffs reasonably relied to their detriment.

100. At the outset of the recruitment process starting in the fall of 2022, Giorgio told Khandaker that he could not leave his current role as Chief Executive Officer at Kraken Financial, d/b/a Kraken Bank ("Kraken") and join SMC unless Khandaker could confirm the company had sufficient funding.

101. Giorgio informed Khandaker that if he stayed in his current role at Kraken through May 2023, he would be eligible for a substantial bonus payment and $8 million in stock options. Khandaker responded by assuring Giorgio that the funding was guaranteed and urging him to start working for SMC in March 2023 rather than waiting.

102. Specifically, Khandaker told Giorgio that, as of February 2023, SMC had raised $2 million in seed funding from outside investors, and had over $1 billion in additional funding via personal bonds and trusts that he was in the process of liquidating to invest in SMC. Before Giorgio began working, Khandaker confirmed that SMC had at least $2 million in funding "in hand" to support initial salaries and costs.

103. These statements were false. SMC either never received the $2 million in its own account, or Khandaker received the funds but then diverted them to a non-SMC account under his control.

104. When Giorgio's first paycheck was due to be paid for March 2023, Khandaker told Giorgio that the seed funding had been delayed and paid him only a portion of his owed salary. The payment came from a Revofast Venture account.

105. When Naik met with Khandaker in the fall of 2022 and early 2023 (both in person and over many virtual conversations), she likewise expressed the need to understand SMC's financial prospects before committing to work for SMC.

106. Khandaker told her that, in addition to the $2 million in seed funding, he had already begun liquidating various personal bonds and trusts worth billions of dollars in order to capitalize SMC, and that the company was more than adequately capitalized.

107. In late 2022 or early 2023 (prior to Plaintiffs' employment), Khandaker told Plaintiffs that he was legally entitled to a family trust funded by reparation payments valued at approximately $1.3 billion, which was administered by a U.K.-based executor (the "Peacock Trust"). Khandaker said he was in the process of liquidating the trust, that the funds would be released by the end of March 2023, and that he intended to invest a substantial portion of the funds in SMC. He also showed Plaintiffs documents corroborating the existence and value of the trust (although not his entitlement to it).

108. Khandaker also told Plaintiffs that SMC had received millions of dollars in outside funding from institutional investors, and showed Plaintiffs screenshare images of spreadsheets and other documents confirming the same, without physically sharing the documents with Plaintiffs.

109. Khandaker's statements about receiving $2 million in seed funding and additional outside funding, and his access to various bonds and trusts, were false. Khandaker was not legally entitled to the trusts he touted, SMC never received much (or any) of the other funds Khandaker noted, and Khandaker diverted a substantial portion, if not all, of the funds it did receive to non-SMC accounts under his control, such that SMC never saw or used those funds.

110. Prior to agreeing to work for SMC, Plaintiffs researched FEDC and the successful offshore companies Khandaker claimed to be associated with, and they spoke with reputable individuals in the fintech industry, including those introduced to them by Khandaker. They also confirmed Khandaker's ability to continually list FEDC as a registered NASDAQ company for over two years, which required him to raise over $100 million in initial commitments while making monthly investments of approximately $110,000 per month.

111. Plaintiffs left prior jobs and forewent other employment opportunities to work at SMC based on Khandaker's misleading actions and false statements. Specifically, Giorgio would not have left his job at Kraken and Naik would have pursued a different job opportunity but for Khandaker's promises regarding the company's liquidity, viability, and future profitability.

## II.     <u>DEFENDANTS ILLEGALLY WITHHELD PLAINTIFFS' EARNED COMPENSATION</u>

**<u>Giorgio's Employment Agreement</u>**

112. On February 16, 2023, Giorgio and SMC entered into an employment agreement effective on March 1, 2023 ("Giorgio Employment Agreement"). Khandaker negotiated the agreement and Karim signed the agreement as "Managing Partner" on behalf of SMC.

113. Giorgio's address listed on the Giorgio Employment Agreement is in Great Neck, New York.

114. SMC's address listed in the Giorgio Employment Agreement is 100 Springhouse Drive, Suite 204, Collegeville, PA 19426.

115. Giorgio executed the agreement in New York, while living in New York.

116. Defendants knew Giorgio would rely on, and be injured by, Defendants' intentional false statements and ultimate breach of the agreement in New York.

117. Pursuant to the agreement, SMC promised to pay Giorgio an annual salary of $450,000 plus benefits ("e.g., Health Ins, 401k, etc.") to work as SMC's CEO. The Giorgio Employment Agreement also provided for an additional conditional bonus and guaranteed cryptocurrency and equity grants that would vest after 3 years: "Bonus: $200,000 annual potential performance bonuses will be given based on company performance. SMCcoin: 500 million (Vested in 3 years)[;] SMC Labs: 1% of company (Vested in 3 years)."

118. The Giorgio Employment Agreement further provided a severance clause entitling him to additional payments in the event he had to resign for "good reason":

**Employment Agreement.** Certain events resulting in the executive's termination or resignation entitle the executive to payments of severance benefits following termination of employment. In the event of the executive's involuntary termination for reasons other than for cause, disability or retirement, *or if the executive resigns for good reason then the executive would be entitled to a cash lump sum payment equal to two times the executive's base salary plus an amount equivalent to the bonus received by, and/or determined to be paid to, the executive* with respect to the year immediately before the year in which such termination occurred (emphasis added).

119. Giorgio worked for SMC from March 1, 2023 through May 7, 2025, when he gave Defendants written notice of his termination of employment and demand for wages, unpaid promissory note payments and "Good Reason" pay.

**Naik's Employment Agreement**

120. On May 26, 2023, Naik and SMC entered into an employment agreement effective on June 1, 2023 ("Naik Employment Agreement"). Khandaker negotiated the agreement and Giorgio signed the agreement on behalf of SMC at Khandaker's direction.

121. Naik's address listed on the Naik Employment Agreement is in New York, New York.

122. SMC's address listed in the Naik Employment Agreement is 100 Springhouse Drive, Suite 204, Collegeville, PA 19426.

123. Naik executed the agreement in New York, while living in New York.

124. Defendants knew she would rely on, and be injured by, Defendants' intentional false statements and ultimate breach of the agreement in New York.

125. Pursuant to the Naik Employment Agreement, SMC promised to pay Naik an annual salary of $400,000 plus benefits ("e.g., Medical, Dental, Vision, LTC, Disability Insurance, Health Insurance, 401k, etc.") to work as SMC's CMO.  The Naik Employment Agreement stated that Naik's "Pay will be disbursed on the 15th and 30 of each month or $16,666.67 per pay period."  It also provided for a guaranteed bonus and conditional additional bonus, stating: "Bonus: $150,000 annual performance bonus potential will be given based on company performance. 10% of annual bonus is guaranteed prorated on a monthly basis."

126. The Naik Employment Agreement provided a severance clause entitling her to additional payments in the event she had to resign for "good reason":

**"Good Reason Clause.** Certain events resulting in the executive's termination or resignation entitle the executive to payments of severance benefits following termination of employment. In the event of the executive's involuntary termination for reasons other than for cause, disability or retirement, or *if the executive resigns for good reason then the executive would be entitled to a cash lump sum payment equal to one time the executive's base salary plus an amount equivalent to the bonus received by, and/or determined to be paid to, the executive* with respect to the year immediately before the year in which such termination occurred."

127. Naik worked for SMC from March 1, 2023 through May 7, 2025, when she gave Defendants written notice of her termination of employment and demand for wages, unpaid promissory note payments and "Good Reason" pay.

**Defendants Fail to Pay Plaintiffs' Wages, While Doubling Down on False Promises to Induce Plaintiffs to Continue Working**

128. Since Plaintiffs began working for SMC in 2023, Defendants failed to pay their full base salaries, guaranteed bonuses and other benefits, including health insurance.

129. Per the terms of Giorgio's Employment Agreement, Defendants had a legal obligation to pay Giorgio a $450,000 annual salary in twice-monthly installments.

130. Instead, however, Defendants infrequently paid Giorgio, and when they did so, paid him substantially less than the per-monthly amount, or, as was often the case, not at all. Payments, when made, came from a Revofast Venture account. These failures resulted in hundreds of thousands of dollars in unpaid wages.

131. For example, in March 2023, Defendants paid Giorgio only $10,000, and in April 2023 paid him only $18,000 (instead of $37,500 each month, as owed per the terms of his Employment Agreement). In September 2023, Defendants paid Giorgio only $3,500, and in many months (for example July 2023, November 2023 and beyond), Defendants did not pay Giorgio at all.

132. By December 2023, Defendants had stopped paying Giorgio entirely. Khandaker told Giorgio he couldn't afford to pay Plaintiffs' salaries at this time, and asked Giorgio to agree to stop accruing salary payments as of January 2024 so that Khandaker could focus on paying monies already overdue to Plaintiffs. Giorgio agreed with the understanding that Khandaker and SMC would make him whole in the first half of 2024.

133. All the while, Giorgio kept performing work for SMC based on Khandaker's continued promises and purported progress towards viability. In June 2024, Khandaker promised Giorgio that he would pay him an additional one-time payment of $200,000 to account for the financial and personal hardship he had endured as a result of Defendants' failure to make good on any of their financial obligations to him.

134. As with Khandaker's other promises, the promised money was never paid to Giorgio.

135. Per the terms of Naik's Employment Agreement, effective June 1, 2023, Defendants were obligated to pay Naik a $400,000 annual salary, in twice-monthly installments.

136. Instead, however, Defendants infrequently paid Naik and when they did so, paid her substantially less than the per-monthly amount, or as was often the case, not at all. Payments, when made, came from a Revofast Venture account. These failures resulted in hundreds of thousands of dollars in unpaid wages.

137. For example, in July 2023, Defendants paid Naik only $15,000, and in August 2023, paid her only $10,000 (instead of $33,333, as owed each month per the terms of her Employment Agreement).  In many months (for example July, September, and November 2023 and beyond), Defendants did not pay her at all.

138. Defendants also failed to pay Naik 10% (*i.e.*, $15,000) of her anticipated $150,000 annual performance bonus, which her employment agreement guaranteed and was to be paid on a prorated monthly basis.

139. Defendants also failed to pay or provide Plaintiffs with any of the benefits outlined in their employment agreements, including health care coverage.

140. Despite Defendants' failure to pay any portion of Plaintiffs' salaries after October 2023, Defendants never terminated Plaintiffs' employment, but rather continually called upon them to keep working for SMC while reiterating the promises of anticipated funding that would enable Defendants to repay the salary, benefits and other monies owed to Plaintiffs.

141. Based on these promises, Plaintiffs continued performing work for SMC and Khandaker through May 2025. For example, Naik continued to provide SMC with marketing and social media materials, slides and summaries for funding pitches, and continued facilitating SMC's access to internet domain names and websites. Giorgio continued to advise Khandaker on

investment opportunities and provided other management and oversight services.

142. Through May 2025, Khandaker continued asking Plaintiffs to perform work for SMC and telling Plaintiffs that he expected to receive funding to be able to pay them "soon," but Defendants never provided Plaintiffs with any further payments.

143. Defendants continued to use Plaintiffs' names, likenesses and experience profiles in marketing materials for the benefit of SMC and other businesses that Khandaker owned or controlled through at least May 2025 and, upon information and belief, continue to use them to this day based on conversations Plaintiffs had with Khandaker.

144. Despite their continued work, Defendants failed to pay Plaintiffs for their continuing work and failed to repay them past amounts owed.

### III.    DEFENDANTS FAILED TO REPAY PLAINTIFFS' LOANS TO SMC

#### SMC and Khandaker Make False Statements About Incoming Funding

145. In 2023, Khandaker and SMC induced Plaintiffs to loan their own personal funds to SMC based on assurances that the loans would be quickly repaid and would enable the company to succeed.

146. To persuade Plaintiffs to make the loans, Khandaker told Plaintiffs that he was in the process of monetizing the Peacock Trust and that the funding date had been definitively set for April 28, 2023.  He also continued showing Plaintiffs updated paperwork regarding the Peacock Trust suggesting that he had a clear legal interest in the trust and authority to control its disposition.

147. April 28 came and went, and Khandaker told Plaintiffs that the funding date had been extended to June 7, and then again to July.

148. At some point over the summer or fall of 2023, as Plaintiffs continued to pressure Khandaker for more information regarding the funding delays, Khandaker told Plaintiffs that, in fact, he did not have a legal interest in the Peacock Trust.  Instead, Khandaker stated that the trust was held in the interest of a family friend and business partner who Khandaker referred to as "Mahbub."

149. Khandaker insisted that Mahbub was a business partner and was going to cash out the trust and invest a substantial portion of the funds into SMC as a social enterprise for building financial systems in emerging markets. To add credibility to his statements, Khandaker showed Plaintiffs official-looking documents for the Peacock Trust that referenced Mahbub by name, and introduced Plaintiffs to Mahbub on Zoom calls.

150. Khandaker also later told Plaintiffs that funds were being transferred to a U.K.-based entity titled "Peacock" that Khandaker created with Mahbub to invest in SMC.  Khandaker also showed Plaintiffs paperwork documenting communications with the trust's executor and demonstrating progress towards funding.

151. Later in 2023 (and again in 2024), Khandaker told Plaintiffs he was traveling to the U.K. in order to finalize the transfer of funds from the Peacock Trust and had remote video calls with Plaintiffs (apparently from England) during which he discussed his meetings with the fund's executor and showed Plaintiffs photos from his trip.

152. Khandaker's statements regarding the Peacock Trust were false and misleading. Khandaker never had any legal entitlement to the Peacock Trust, and its funds were never in the process of being transferred to Khandaker, Mahbub, or any entity or trust that Khandaker controlled.

153. Khandaker made additional false or misleading statements in order to induce Plaintiffs to continue working and to lend money to SMC.

154. For example, Khandaker told Plaintiffs that he was legally entitled by birthright to Indian bonds worth more than $1 billion, and further had an interest in an Indian land parcel worth approximately $15 million, cryptocurrency bonds valued over $600 million and Japanese bonds worth over $1 billion, all of which he was in the process of monetizing to invest in maintaining SMC's liquidity and viability.

155. Khandaker did not just generically reference these funding sources but spoke about them often and in great detail, and showed Plaintiffs various documents purporting to validate their existence and value.

156. These statements were false or misleading because Khandaker never had a clear legal interest or entitlement to any of the funds or investments at issue, and he did not have any reliable means of monetizing them, despite representing to Plaintiffs that he did.

**SMC and Khandaker Used False Representations About Pending Funding to Secure Personal Loans from Plaintiffs**

157. Against the backdrop of lies concerning his financial interest in the Peacock Trust, land and assets in India, and Japanese bonds, in or around September 2023, Khandaker told Plaintiffs that by November 15, 2023, the funding would be available from some or all of the various sources he had described, and that the company just needed a short-term infusion of cash to cover the shortfall through that date.

158. Khandaker asked Plaintiffs to make short-term loans to SMC to cover employee wages and agreed to give them favorable loan terms, including a prompt repayment date.

159. When Plaintiffs asked Khandaker if they should start looking for new jobs given SMC's current funding shortage, Khandaker said, "No," and strongly discouraged them from

leaving the company or finding other opportunities. He said he just needed another month or two to secure additional funding and that Plaintiffs' loans would keep the company on solid footing until then.

160. Plaintiffs – at this point each in their respective roles less than six months – relied on Khandaker's representations about his ability to secure funding for SMC and to therefore repay them all monies owed.

**Plaintiffs Entered into Promissory Notes to Loan Money to SMC**

161. On September 14, 2023, Plaintiffs entered into separate Promissory Notes with SMC. Both notes were based on templates that Khandaker provided, were negotiated and approved by Khandaker, and were signed by Giorgio, at Khandaker's direction, on behalf of SMC.

162. According to Khandaker, the purpose of both loans was to pay employee compensation.

163. In the case of Naik, she had been forced to withdraw significant sums from her 401(k) retirement account in order to provide for herself and her family in the absence of receiving the salary owed to her by SMC. She did so at Khandaker's suggestion and representation that SMC would soon receive additional funding to repay her. Doing so, however, caused Naik to incur tax and other penalties.

164. Thus, Naik's promissory note formalized Khandaker's and SMC's promise to repay Naik the money withdrawn from her 401(k) account.

165. When Naik later informed Khandaker that she would incur tax penalties due to her having made an early withdrawal on her 401(k) that was not promptly repaid by the company, Khandaker suggested that she request an extension on her tax filing deadline or seek relief based

on "the loss of money, like not getting money from the promissory note," which she understood was not possible or legal. As a result, Naik is still paying monthly penalties and fees due to her early 401k withdrawal to this day.

166. In Giorgio's promissory note, he lent the company $90,000 with a maturity date of November 13, 2023.

167. Giorgio's loan was deposited into SMC's bank account at First Republic Bank, which Khandaker controlled.

168. Under the terms of his note, Giorgio was entitled to guaranteed interest of $5,000 covering the first month of the loan, and a per diem interest rate of $166.67 per day thereafter until the maturity date, after which the per diem rate would increase to $333.33 per day. Following an Event of Default, Giorgio was entitled to an additional 10% annual interest rate, plus a 5% late payment amount.

169. Naik's promissory note lent the company $200,000 with a maturity date of December 9, 2023.

170. Under the terms of her note, Naik was entitled to guaranteed interest of $5,000 covering the first month of the loan, and a per diem interest rate of $166.67 per day thereafter until the maturity date, after which the per diem rate would increase to $250 per day. Following an Event of Default, Naik was entitled to an additional 10% annual interest rate, plus a 5% late payment amount.

171. Both notes provide that failure to timely pay the loan when due constitutes an Event of Default.

172. Both notes further provide that SMC shall be liable for Plaintiffs' costs in enforcing the notes, including attorneys' fees and expenses.

173. Both promissory notes listed Plaintiffs' New York addresses.

174. Both Plaintiffs executed their respective notes in New York, as residents of New York, and Defendants knew that Plaintiffs would rely on, and be injured by, Defendants' intentional false statements and ultimate breach of the notes in New York.

175. Both notes contain clear choice of law provisions stating that the notes and their "validity, enforcement and interpretation shall be governed by the laws of the State of New York (without regard to any principles of conflicts of laws) and applicable United States federal law."

176. Both notes also contain a forum selection clause under which parties "unconditionally" submit to the jurisdiction of New York state and federal courts, and waive any objection to venue in such courts.

**SMC Defaults on Plaintiffs' Loans**

177. After accepting Plaintiffs' loans, Khandaker informed Plaintiffs that the expected funding date for the India land sale had been pushed back, and that the other potential sources of funding, including from the Peacock Trust and other private institutional investment opportunities, were delayed.

178. November 2023 came and went without any funding, or payment to Plaintiffs.

179. At this point, things began to deteriorate further and the company was unable to maintain investments or profits sufficient to pay any portion of Plaintiffs' salaries or even fund everyday business expenses.

180. Since his hire, Giorgio had been forced to carry significant company expenses totaling over $30,000 on his personal credit card just to be able to continue to work.

181. After the maturity dates lapsed on Plaintiffs' promissory notes, Defendants failed to repay any portion of the loans, or the interest or penalties thereon, which continue to accrue.

182. After repeated questions and conversations, in or around December 2023, Giorgio confronted Khandaker over text regarding the substantial funds owed to Plaintiffs and the serious harm Defendants had caused them. In response, Khandaker, pretending to be the harmed party, told Naik that Giorgio had "crossed the line" and therefore Khandaker was "no longer morally obligated to support him." Prior to this, Khandaker acknowledged that he "let [Plaintiffs] accumulate salaries per month and took moral obligation to pay [them] back."

183. In the same conversation, Naik reminded Khandaker that he had discouraged Plaintiffs from finding new jobs before entering into the promissory notes, and that if he had been transparent with Plaintiffs, they would not have stayed with the company or lent the company money.

184. Khandaker did not materially respond to Naik's texts, except to say that he would review Naik's list of the funds owed to her based on Defendants' missed salary and loan payments.

185. Over the following months, Khandaker continually moved back the date of expected funding by weeks or months, but again, the funding never appeared.

186. Khandaker continued to make additional false statements, including a long string of false statements regarding current infusions of cash and future investments from the U.K., Japan and Bangladesh, and other countries, as well as from U.S. investments, in order to induce Plaintiffs to continue performing work for SMC.

187. In the meantime, the clients continued performing work and relied on Dr. Khandaker's promises that they would be paid in full soon.

188. Both Plaintiffs feared that if they stopped working and supporting the company, they would have no chance of ever receiving the monies SMC owed to them for their time and effort.

189. To date, Defendants have failed to repay a single penny of Plaintiffs' promissory notes or the interest and fees that continue to accrue.

## IV. DEFENDANTS ABUSED THE CORPORATE FORM TO DEFRAUD EMPLOYEES AND AVOID LIABILITY

190. From SMC's inception, Defendants, and in particular Khandaker (and Revofast Venture acting through Khandaker and under his control), have disregarded corporate formalities and abused the corporate form in order to defraud Plaintiffs (and others).

191. Khandaker dominated and controlled SMC from its inception, making all key strategic, personnel and financial decisions, controlling financial accounts and investor relations, investing in SMC and occasionally paying its debts from sources that he controlled (including Revofast Venture, FEDC, other businesses, or his own personal or family funds including, according to Khandaker, his wife's 401k account), and transferring funds that were paid to or invested in SMC to other businesses or personal accounts that he controlled, including Revofast Venture and FEDC, instead of using them to pay SMC's obligations.

192. Khandaker directed Naik and Giorgio as to the specific work they should perform for SMC, meeting with them regularly to provide them with direction. No company action was taken without Khandaker's knowledge and approval.

193. Khandaker also claimed a majority ownership interest in shares of privately held SMC equity, and determined which other employees or investors would be able to own other shares.

194. With respect to personnel matters, Khandaker acted as the sole direct employer for all SMC employees, including Plaintiffs.

195. Khandaker negotiated all employment agreements and decided to hire Plaintiffs and other employees (and had the authority to terminate them at-will).

196. Khandaker also determined Plaintiffs' salaries, and while Plaintiffs were often not paid at all, Khandaker determined when and how much they were to be paid on the occasions when they did receive compensation, including by facilitating their salary payments from a Revofast Venture account that he controlled.

197. Khandaker supervised Plaintiffs and other employees. He communicated with them (via phone, email, text or chat) daily and was the person Plaintiffs reported to and met with one or twice weekly.

198. Khandaker also maintained employment and pay records for Plaintiffs and other employees.

199. While SMC had a Board of Directors ("Board"), consisting of Khandaker, Karim, and two other individuals (Dr. Justin Shi and Michael Tomcyzk), it met irregularly and did not routinely keep minutes or records of discussions or decisions.

200. The Board primarily existed as a sounding board for Khandaker rather than a deliberative body. For example, at one point Khandaker unilaterally decided to make Giorgio a "Co-CEO" (together with Shi) and communicated this decision to the Board via email.

201. Along with SMC, Khandaker also dominated and controlled Revofast Venture and FEDC.

202. Several or all of the Board members that Khandaker appointed to the SMC Board also served as officers or board members for Revofast Venture, FEDC or other entities that Khandaker owned or controlled. For example, Tomcyzk and Karim both were on FEDC's Board.

203. According to FEDC's SEC filings, Khandaker controlled a substantial portion of FEDC's stock (approximately 97% of Class B common stock, with Class A stock held by

institutional investors), including all shares held by Revofast Venture, as to which Khandaker had "sole voting and dispositive power."

204. Khandaker also signed corporate documents for SMC, Revofast Venture, and FEDC.

205. Khandaker used the same corporate address (100 Springhouse Drive, Suite 204, Collegeville, PA 19426) for SMC, Revofast Venture, and FEDC, including for corporate agreements, SEC filings, registrations and other documents entered in their names.

206. Khandaker used his controlling role as founder and owner of SMC, Revofast Venture and FEDC to financially entangle and integrate the companies, including by using Revofast Venture to repeatedly transfer funds between SMC, Revofast Venture, FEDC and other entities as he saw fit.

207. While Giorgio had some visibility into SMC's bank account as CEO, he did not control the account, and could not deposit or withdraw funds from the account without Khandaker's approval.

208. In early 2023, Khandaker told Plaintiffs that SMC had received millions of dollars in funding from multiple investors, including Manhattan West.  Khandaker repeatedly told Plaintiffs about these investments and he showed Giorgio financial records purporting to document the funds received.  Khandaker also shared purported screen shots of SMC's accounts with Giorgio to confirm that SMC had raised millions of dollars in funding. However, Khandaker diverted these funds into an account Giorgio could not access, and SMC never received the funds.

209. When Plaintiffs questioned Khandaker about the improper diversion of funds, he brushed them off, saying he "had other things to pay."

210. Khandaker also occasionally transferred funds from Revofast Venture or FEDC, and from his own personal or family accounts, to pay SMC's obligations, (but notably, never to repay Plaintiffs' notes or pay waged owed).

211. Defendants also failed to observe corporate formalities and customary practices when paying Plaintiffs' salaries (on the occasions when Plaintiffs were paid).

212. For example, Defendants failed to provide Plaintiffs with wage notices and accurate wage statements as statutorily required under New York law.

213. Instead, when Khandaker did pay Plaintiffs' salaries, he did so by wiring or transferring funds from Revofast Venture rather than paying them from SMC's own bank account. Plaintiffs only knew they were paid by reviewing their personal bank statements and finding a payment from Revofast Venture. Plaintiffs never received written paystubs.

214. Khandaker directly controlled Plaintiffs' salary payments and initiated them at his discretion and whim. Khandaker also made false statements regarding these payments.

215. Khandaker treated SMC, Revofast Venture and FEDC as a single integrated company under his exclusive control. For example, he established a single account with various vendors (e.g., for advertising, investor relations, recruitment, etc.) for all three companies (and potentially others that he controlled), and paid invoices for services provided to all three companies from the same account.

216. Khandaker also instructed Naik to procure and build out a single customer relationship management ("CRM") system as a unified platform for emails, sales and marketing across SMC, Revofast Venture and FEDC, effectively treating them as an integrated enterprise.

217. None of the financial transactions among SMC, Revofast Venture and FEDC were at arm's length or approved by the Board or legal counsel.  Instead, Khandaker unilaterally controlled all three companies and shifted funds between them to suit his purposes.

218. Khandaker also knew that at all relevant times, SMC was grossly undercapitalized. Despite repeatedly telling Plaintiffs that the company had millions or billions in available cash, this was false because the company never had sufficient funding to pay its debts, including Plaintiffs' and other employees' salaries, loans or other obligations.

219. Plaintiffs were not the only ones who suffered from SMC's fraudulent misrepresentations, false promises, and improper diversion of company funds.  Besides Plaintiffs, Defendants failed to pay the salaries of other employees, several of whom, including SMC's Chief Technology Officer and Chief Information Security Officer, also retained lawyers and sought legal relief.

220. Defendants also failed to pay their obligations to various vendors, including for website hosting and advertising services, investor relations services, and recruitment services provided by Storm Recruiter. As of today, the company owes Plaintiffs and others millions of dollars in unpaid wages and debts.

221. Defendants continue to avoid payment of wages and debts, including those owed to Plaintiffs, despite continuing the business operations of SMC through business entities with the same business purpose as SMC (specifically, Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain). As evidenced by marketing materials for these companies, Khandaker continues to disregard corporate formalities, and dominates and controls all aspects of these businesses in the same and similar ways to those described in this complaint.

V.    **DEFENDANTS FAILED TO PAY PLAINTIFFS AFTER RECEIVING PLAINTIFFS' 'GOOD REASON' NOTICE**

**Plaintiffs Notify Defendants of Liability and End Their Employment**

222. On May 7, 2025, Plaintiffs' counsel sent a letter to Defendants notifying SMC, Revofast Venture, Khandaker and Karim of the Company's substantial liability (which, per the letter, extends to all named Defendants as members, owners, employers, and/or alter egos of SMC under New York law) and demanding prompt repayment.

223. Specifically, the letter stated that Defendants owe Plaintiffs' unpaid wages, including guaranteed bonuses, additional amounts for Defendants' breach of the Good Reason provision in their employment agreements and unpaid loans under their promissory notes, together with interest, attorneys' fees and costs.

224. The letter also gave notice to Defendants that Plaintiffs were resigning from their employment with SMC based on "Good Cause."

225. With respect to the Good Reason clause, the letter notified Defendants that Plaintiffs were formally resigning from employment due to Defendants' failure to pay their wages and other amounts owed, thereby triggering their Good Reason payments.

226. Pursuant to Giorgio's Employment Agreement's Good Reason clause, he is owed at least $900,000 (twice his base salary ($450,000)) plus any eligible bonus amounts up to $200,000 for the year prior to his resignation.

227. Pursuant to Naik's Employment Agreement's Good Reason clause, she is owed at least $400,000 (her base salary of $400,000) plus a guaranteed bonus of $15,000 (10% of $150,000) and up to an additional $150,000 for the year prior to her resignation.

228. Plaintiffs' May 7, 2025 letter also specifically notified Defendants of their liability as alter egos of SMC, including due to Khandaker's control of the company and his

"involvement running SMC and Revofast Venture, including in decision-making, the co-mingling of funds between SMC and Revofast Venture and use of Revofast Venture funds for SMC purposes, including paying employees, and the companies' shared principal address."

229. The letter further notified Defendants of potential liability as owners, managers or shareholders of SMC under NY BCL § 630, which is substantially identical to NY LLCL § 609(c) for this purpose.

230. Khandaker responded to Plaintiffs' demand letter by reaching out to Plaintiffs directly over phone and text.  In his calls to Plaintiffs, Khandaker asked Plaintiffs to give him until June 2025 to come up with a repayment plan.  He said would "do his best" to repay the amounts owed. He never did.

231. On July 24, 2025, Plaintiffs' counsel sent a second notice letter to Defendants and the SMC's Board other members (Dr. Justin Shi and Michael Tomcyzk), again notifying them of Defendants' liability for Plaintiffs' outstanding wages and debts, and their personal liability under NY BCL § 630 (which, again is substantially identical to NY LLCL §  609(c) for this purpose).

232.  On August 4, 2025, Karim sent a letter to Plaintiffs' counsel on SMC letterhead, acknowledging Defendants' receipt of Plaintiffs' notice letter.  In the letter, Karim stated that he is the Managing Member of SMC, and that SMC is "non-operational and holds no assets due to financial constraints."

233. Based on evidence of SMC's continued operation described in this complaint, including SMC's ongoing fundraising, marketing, and hiring efforts, this statement was false.

234. Since August 2025, Defendants have failed to make any efforts to contact Plaintiffs or to repay their wages, loans or other amounts owed.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Breach of Contract and Breach of Implied Covenant of
Good Faith and Fair Dealing—Promissory Notes
(Against All Defendants)**

235. Plaintiffs reallege and incorporate by reference all preceding allegations in this Complaint.

236. On September 14, 2023, Plaintiffs entered into promissory notes pursuant to which they agreed to lend their personal funds (including, for Naik, portions of her 401k account) to SMC based on Defendants' promises that their loans would quickly be paid under the terms set forth therein.

237. Under the terms of Giorgio's promissory note, he agreed to loan SMC $90,000 with maturity date of November 13, 2023.

238. Under the terms of Naik's promissory note, she agreed to loan SMC $200,000 with maturity date of December 9, 2023.

239. Plaintiffs performed their obligations under the promissory notes by delivering the agreed upon loan amounts to SMC.

240. Defendants failed to honor the promissory notes by refusing to repay any portion of the principal, or any interest and fees incurred therefrom, in breach of contract.

241. Defendants also breached the promissory note agreements' implied covenant of good faith and fair dealing by diverting Giorgio's loan, which was given to support SMC's present and future viability, to other entities or accounts that Defendants owned and controlled, including Revofast Venture, FEDC or others.

242. Defendants further breached the promissory notes' implied covenant of good faith and fair dealing by diverting investments and funds from other sources that were intended to be

used by SMC, and that otherwise could have been used to repay Plaintiffs' notes, to other entities or accounts that Defendants owned and controlled, including Revofast Venture, FEDC or others.

243. In so doing, Defendants acted arbitrarily and irrationally so as to delay and ultimately prevent Plaintiffs from being able to exercise their contractual rights.

244. Khandaker and Revofast Venture (acting through Khandaker) are liable as alter egos of SMC to the extent they unilaterally dominated and controlled SMC as part of a single, integrated economic unit under Khandaker's control for the purpose of defrauding and harming Plaintiffs.

245. As owners and members among those with the ten largest ownership interests in SMC, Khandaker and Karim are personally liable for Plaintiffs' unpaid debts, wages or salaries pursuant to NY LLCL § 609(c), which makes the ten members with the largest percentage ownership interest in a domestic or foreign LLC jointly and severally liable for the unpaid "debts, wages or salaries" due to employees who worked in New York State.

246. Plaintiffs provided written notice to all Defendants of their potential liability as owners, managers, shareholders or alter egos pursuant to New York law in Plaintiffs' May 7, 2025 letter and July 24, 2025 letter, which Karim acknowledged on behalf of all Defendants in his response letter of August 4, 2025.

247. Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain, if determined not to be the same company as SMC, are liable as successor(s) in interest to SMC, mere continuation(s) of SMC, a *de facto* merger(s) with SMC, and/or a fraudulent attempt(s) to avoid the liabilities and debts of SMC.

248. As a result of Defendants' breaches, Plaintiffs have incurred damages including, but not limited to, the loss of their principal loan amounts, interest, late fees, and attorneys' fees and

expenses, as provided for under the promissory notes, and any other amounts owed under applicable law.  Plaintiffs have also suffered lost opportunity costs, and been forced to take on additional personal debt, including credit card debt, as a result of Defendants' breaches.

## SECOND CAUSE OF ACTION
### NYLL Article 6, §§ 193, 198– Unpaid Wages
### (Against All Defendants)

249. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

250. The foregoing conduct, as alleged, violates the NYLL.

251. At all relevant times, Defendants acted as Plaintiffs' "employer" under NYLL §190 and § 651.

252. At all relevant times, Plaintiffs were "employees" under NYLL §190 and § 651.

253. Pursuant to New York Labor Law § 193, no employer shall make any deduction from the wages of an employee except as authorized by law.

254. Pursuant to New York Labor Law § 198, employers are liable for underpayment (or non-payment) of wages owed to employees.

255. Throughout the relevant period, Defendants have made unlawful deductions and/or failed to pay Plaintiffs' wages and benefits owed under their respective Employment Agreements, while inducing Plaintiffs to continue working based on false statements and promises as alleged above.

256. Defendant's failure to pay wages was willful and not in good faith, within the meaning of NYLL § 198(1-a).

257. As Plaintiffs' direct employer, who exercised direct operational control over SMC, and who hired Plaintiffs, negotiated their salaries, decided when and how much to pay them,

oversaw their work and had authority to terminate their employment, Khandaker is personally liable under the NYLL.

258. Khandaker and Revofast Venture (acting through Khandaker) are also liable as alter egos of SMC to the extent they unilaterally dominated and controlled SMC as part of a single, integrated economic unit under Khandaker's control for the purpose of defrauding and harming Plaintiffs.

259. As owners and members among those with the ten largest ownership interests in SMC, Khandaker and Karim are personally liable for Plaintiffs' unpaid debts, wages or salaries pursuant to NY LLCL § 609(c).

260. Plaintiffs provided written notice to Defendants of their potential liability as owners, managers, shareholders or alter egos pursuant to New York law in Plaintiffs' May 7, 2025 letter and July 24, 2025 letter, which Karim (as Managing Member) acknowledged on behalf of all Defendants in his response letter of August 4, 2025.

261. Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain, if determined not to be the same company as SMC, are liable as successor(s) in interest to SMC, mere continuation(s) of SMC, a *de facto* merger(s) with SMC, and/or a fraudulent attempt(s) to avoid the liabilities and debts of SMC.

262. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered damages in the amount of the unpaid wages due and owing, together with liquidated damages, prejudgment interest, and reasonable attorneys' fees and costs as provided by the New York Labor Law.

### THIRD CAUSE OF ACTION
**Breach of Contract and Breach of Implied Covenant of
Good Faith and Fair Dealing—Breach of Good Reason Clause
(Against All Defendants)**

263. Plaintiffs reallege and incorporate by reference all preceding allegations in this Complaint.

264. Plaintiffs entered into Employment Agreements with SMC that provide for severance pay in the event that Plaintiffs resign for "Good Reason."

265. Both Employment Agreements are valid and enforceable.

266. The Giorgio Employment Agreement, effective March 1, 2023, provides that, if Giorgio "resigns for good reason," then he is entitled to "a cash lump sum payment equal to two times [Giorgio's] base salary plus an amount equivalent to the bonus received by, and/or determined to be paid to, the executive" in the year prior to resignation or termination.

267. Similarly, the Naik Employment Agreement, effective June 1, 2023, provides that, if Naik "resigns for good reason," then she is entitled to "a cash lump sum payment equal to one time [Naik's] base salary plus an amount equivalent to the bonus received by, and/or determined to be paid to, the executive" in the year prior to resignation or termination.

268. The Naik Employment Agreement further provided for a guaranteed annual bonus of at least $15,000 (10% of her anticipated $150,000 annual performance bonus).

269. Plaintiffs performed their obligations under their respective Employment Agreements by performing valuable work for SMC in accordance with the Employment Agreements.

270. Defendants' failure to pay Plaintiffs' wages and benefits, and repay Plaintiffs' promissory notes, constituted Good Reason for Plaintiffs to terminate their employment relationship with SMS and Khandaker.

271. Plaintiffs provided written notice to Defendants of their resignation from SMC due to Defendants' failure to pay them their wages and benefits, and repay their promissory notes, and accordingly, their entitlement to "Good Reason" severance payments on May 7, 2025.

272. Upon Plaintiffs' resignation, Defendant became contractually obligated to pay Plaintiffs the "Good Reason" severance benefits described in their Employment Agreements.

273. Defendants failed to honor their obligations under the Employment Agreements by failing to pay Plaintiffs' "Good Reason" severance payments after Plaintiffs' resignations, thereby breaching the Employment Agreements.

274. Defendants further breached the Employment Agreements' implied covenant of good faith and fair dealing by diverting investments and funds that were intended to be used by SMC, and that otherwise could have been used to pay Plaintiffs' "Good Reason" severance payments, to other entities or accounts that Defendants' owned and controlled, including Revofast Venture, FEDC or others.

275. In so doing, Defendants acted arbitrarily and irrationally so as to delay and ultimately prevent Plaintiffs from being able to exercise their contractual rights.

276. Khandaker and Revofast Venture (acting through Khandaker) are liable as alter egos of SMC to the extent they unilaterally dominated and controlled SMC as part of a single, integrated economic unit under Khandaker's control for the purpose of defrauding and harming Plaintiffs.

277. As owners and members among those with the ten largest ownership interests in SMC, Khandaker and Karim are personally liable for Plaintiffs' unpaid debts, wages or salaries pursuant to NY LLCL § 609(c).

278. Plaintiffs provided written notice to Defendants of their potential liability as owners,

managers, shareholders or alter egos pursuant to New York law in Plaintiffs' May 7, 2025 letter and July 24, 2025 letter, which Karim (as Managing Member) acknowledged on behalf of all Defendants in his response letter of August 4, 2025.

279. Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain, if determined not to be the same company as SMC, are liable as successor(s) in interest to SMC, mere continuation(s) of SMC, a *de facto* merger(s) with SMC, and/or a fraudulent attempt(s) to avoid the liabilities and debts of SMC.

280. As a result of Defendants' breaches, Plaintiffs have incurred damages including, but not limited to, the loss of their contractually promised severance benefits, plus interest, attorneys' fees and expenses, as provided for under their Employment Agreements and applicable law.

### FOURTH CAUSE OF ACTION
**Fraudulent Inducement**
**(Against All Defendants)**

281. Plaintiffs reallege and incorporate by reference all preceding allegations in this Complaint.

282. SMC, Khandaker and Revofast Venture (acting through Khandaker) made a series of material misrepresentations and omissions to Plaintiffs to induce them to leave their prior jobs and/or forego other job opportunities, to agree to work for SMC and to continue working even while their salaries were not being paid in full, and to loan substantial amounts of money to SMC pursuant to promissory notes.

283. As owners and members among those with the ten largest ownership interests in SMC, Khandaker and Karim are also personally liable for Plaintiffs' unpaid debts, wages or salaries owed as a result of Defendants' fraudulent misrepresentations.

284. As alleged above, these statements include material misrepresentations, material

omissions of fact and false promises, which were false, and known to be false by Defendants when made, regarding, inter alia, SMC's liquidity and financial viability. These include both verbal and written statements about investments that SMC had received or was in the process of receiving, and statements that certain payments had been made to Plaintiffs or were in the process of being paid to Plaintiffs.

285. Defendants knew these representations, omissions and promises were false at the time the statements were made or omitted, and they made them to induce Plaintiffs to act in their favor (and at Plaintiffs' expense) by agreeing to work and continuing to work for SMC, allowing SMC to use their names, reputations and likenesses in marketing materials for SMC, Revofast Venture and FEDC, and investing their own funds into SMC.

286. Defendants intended that Plaintiffs would rely on their false representations, omissions and promises.

287. But for Defendants' false representations, omissions and promises, Plaintiffs would never have accepted employment with SMC, loaned money to SMC, or continued working for SMC after Defendants' initial non-payment of their wages.

288. In contravention of their representations and promises, Defendants failed to pay Plaintiffs their waged as owed, and failed to repay any portion of their promissory notes. Defendants also failed to use investments and funds that SMC did receive to pay Plaintiffs' wages and promissory notes.

289. Defendants never intended to fulfill their promises to pay Plaintiffs their wages owed or the amounts owed on their promissory notes.

290. Plaintiffs reasonably relied on Defendants' representations and promises, to their significant economic detriment.

291. As a result, Plaintiffs have incurred damages, including, but not limited to, lost wages and benefits, and lost payments, interest and fees on their promissory notes.

292. Defendants' conduct amounts to such gross, wanton or willful fraud, dishonest and intentional non-disclosure of material facts as to involve a high degree of moral culpability, making it appropriate to deter Defendants from engaging in similar conduct in the future.

293. Plaintiffs provided written notice to Defendants of their potential liability as owners, managers, shareholders or alter egos pursuant to New York law in Plaintiffs' May 7, 2025 letter and July 24, 2025 letter, which Karim (as Managing Member) acknowledged on behalf of all Defendants in his response letter of August 4, 2025.

294. Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain, if determined not to be the same company as SMC, are liable as successor(s) in interest to SMC, mere continuation(s) of SMC, a *de facto* merger(s) with SMC, and/or a fraudulent attempt(s) to avoid the liabilities and debts of SMC.

295. For the foregoing reasons, the Court should award Plaintiffs compensatory damages, costs, interest, punitive damages, exemplary damages, and attorneys' fees.

**FIFTH CAUSE OF ACTION**
**NYLL Article 6, § 195(3) – Failure to Provide Accurate Wage Statements**
**(Against Defendants)**

296. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

297. NYLL § 195(3) requires that employers furnish employees with a written statement for each payment of wages listing, inter alia: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece,

commission, or other; gross wages; deductions and net wages.

298. Defendants have failed to provide Plaintiffs with any wage statements for each pay period, and accordingly have violated NYLL § 195(3).

299. Defendants' failure to comply with NYLL § 195(3) was willful.

300. As Plaintiffs' direct employer, who exercised direct operational control over SMC, and who hired Plaintiffs, negotiated their salaries, decided when and how much to pay them, oversaw their work and had authority to terminate their employment, Khandaker is personally liable under the NYLL.

301. Khandaker and Revofast Venture (acting through Khandaker) are also liable as alter egos of SMC to the extent they unilaterally dominated and controlled SMC as part of a single, integrated economic unit under Khandaker's control for the purpose of defrauding and harming Plaintiffs.

302. As owners and members among those with the ten largest ownership interests in SMC, Khandaker and Karim are personally liable for Plaintiffs' unpaid debts, wages or salaries pursuant to NY LLCL § 609(c).

303. Plaintiffs provided written notice to Defendants of their potential liability as owners, managers, shareholders or alter egos pursuant to New York law in Plaintiffs' May 7, 2025 letter and July 24, 2025 letter, which Karim (as Managing Member) acknowledged on behalf of all Defendants in his response letter of August 4, 2025.

304. Defendants SMC Labs, SMC Labs Bd, Ltd., TOI Labs, and TOI Chain, if determined not to be the same company as SMC, are liable as successor(s) in interest to SMC, mere continuation(s) of SMC, a *de facto* merger(s) with SMC, and/or a fraudulent attempt(s) to avoid the liabilities and debts of SMC.

305. Due to Defendants' willful violations of NYLL § 195(3), Plaintiffs are each entitled to statutory penalties of $250 for each workweek that Defendants failed to provide them with accurate wage statements, or a total of up to $5,000, as well as reasonable attorneys' fees, costs, and injunctive and declaratory relief, as provided for by the NYLL § 198(1-d).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, respectfully requests that this Court grant the following relief:

A.  Monetary relief to compensate Plaintiffs fully for all harms identified in this complaint;

B.  Issuance of a declaratory judgment that the practices complained of in this complaint are unlawful under New York law, including NYLL, Article 6, §§ 190, *et seq.*;

C.  An award of liquidated damages and punitive damages permitted by law;

D.  Appropriate equitable and injunctive relief to remedy Defendants' violations of applicable law, including but not limited to an order enjoining Defendants from continuing their unlawful practices;

E.  Penalties, as provided by law;

F.  Attorneys' fees and costs of action incurred herein, including any expert fees;

G.  Pre-judgment and post-judgment interest, as provided by law;

H.  Such other legal and equitable relief as this Court deems necessary, just, and proper; and

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 27, 2026          Respectfully submitted,
       New York, New York

_____
Gregory S. Chiarello
**OUTTEN & GOLDEN LLP**
685 Third Ave., 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
gchiarello@outtengolden.com

*Attorneys for Plaintiffs*